Mr. Abbott filed an application for disability benefits in June 2000 alleging he had become disabled in August of 1998. My hearing was held on July 11, 2002, resulting in an unfavorable decision at what we call Step 5, which means that it had been determined that he could no longer perform his past relevant work, but that there was other work that was available for Mr. Abbott to do. The issues in this case that we think come to this Court are basically two. One is the hypothetical question that was asked of the vocational expert in this case. And the hypothetical question was based upon a residual functioning capacity assumption that Mr. Abbott had the physical capacity to perform light work, when in fact there was no evidence of that fact in this record. In fact, the doctors who had been treating Mr. Abbott for some period of time, all in at least the attending physician, Dr. Bateman, was of the opinion that Mr. Abbott was totally disabled and was not able to work on a full-time basis. Would you comment on the Commissioner's argument that Dr. Bateman goes back and forth and severely limited in checking the boxes, and therefore the judge was appropriately discounted his commentary? The forms that you refer to are forms that are filled out by doctors for the benefit of the individual and are submitted to the Department of Social Services because Mr. Abbott is on public assistance. In order for him to receive public assistance, he has to establish that he's physically incapable of work. The fundamental misunderstanding or the misinterpretation, I think, by the ALJ in this case is only to look at one portion of the form, not the whole section that refers to the various categories of work. You simply cannot look at sedentary or severely limited and simply say that ends the inquiry. The same section, that same part of the form asks the doctor to express an opinion as to how long the individual will be able to work at less than half-time. And consistently throughout, as we've shown in the table in our brief, is that for the first form that was submitted in July of 1999, he estimated that Mr. Abbott at that time and this was early on when he was first beginning to see the claimant, he estimated that at least for the next four to six months, Mr. Abbott would be able to function at less than half-time or half-time or less for the next four to six months. For the remaining numbers of forms that were filled out, he said it was indefinite, basically saying this fellow's never going to get back to any kind of gainful employment. You don't look at just the box of sedentary or severely limited. You have to look at the whole section. And consistently throughout the entire record, Dr. Bateman has said that the claimant cannot function in the workplace. The Social Security Administration sent Mr. Abbott to see Dr. Dean for a consultative examination. He cited the regulations that talk about the qualifications of these individuals. And Dr. Dean, very consistently with what Dr. Bateman says, this fellow can work maybe two hours a day. That's it. And I don't know. Is there any doctor in this record that says he's not disabled? No. Because usually in these cases there is such a doctor, but we don't have that here. Well, Dr. Hoskins. Well, you know, I think that's inconsistent with the bulk of the evidence. One of the things we pointed out. In answer to the question you were asked, there is another doctor. Yeah. I don't really think there is any doctor. At least there's no treating doctors. Well, that makes sense. Okay. And Dr. Dean, who was the one consulting doctor that did the consultative examination at the request of Social Security, concurs in the opinion of Dr. Bateman. One of the criticisms was in this case is that ALJ said, well, these doctors don't set forth functional limitations in their reports. Well, that's not the function of medical records typically. Doctors have a process. They have a way of writing notes. We set that forth in our brief. And they're not typically asked to assess function. Doctors who have seen Dr. or Mr. Abbott either for purposes of treatment or for purposes of consultation have all indicated very significant problems that would, in any individual, limit this person's ability to work. I think what the ALJ did in this case is try to make an inconsistency when there was none, simply by misinterpreting or misreading what those DSHS forms indicate. Because there really isn't any inconsistency. Dr. Bateman has been consistent throughout. The other thing is in the vocational questions that were asked of the vocational expert here, the ALJ assumed that Mr. Abbott could function at the light level of work activity on a full-time, eight-hour-a-day basis. Even if you accept the judge's interpretation of the DSHS forms, which I'm not suggesting, that maybe there's some capacity to do sedentary work, don't base a hypothetical question on a vocational expert based on light work when there's no evidence, no significant evidence, that Mr. Abbott could perform at the light level of capacity. We're asking that disability benefits be awarded. Thank you. May it please the Court, David Burdett, representing the Commissioner of Social Security. There is not a lot, as you will have taken from the briefs, that I want to say as regards matters of law. It's mostly a dispute as to the interpretation of facts. Let me ask you this, if I might, moving directly to Dr. Hoskins. Did Dr. Hoskins actually see the patient, or was he just reading files? No, he was just reading files, Your Honor. So he did not examine this person? He was not an examining physician. And usually the inference that is often drawn from that is that his opinion is less credible. But that's the point, I'm sure, that you're getting at here. I'm not sure I want to use credibility because that suggests truth-telling or not truth-telling, but we attach less weight to it. Yes. But that is evidence, and that means that the opinion of the doctor who says that he can't do any work at all or that he's severely limited in the language of the DSHS form is, in fact, contradicted. So we're out of the world of clear and convincing evidence and down to specific reasons for the ALJ to not adopt one doctor's opinion over another. And, you know, it may be that this is just one doctor over another. We've got the treating physician, Dr. Deem, who was first called in, who supported the treating physician, and then we've got Dr. Hoskins, who only reviewed the file. That's right, Your Honor. That's true. I would point out, though, that even as between Dr. Bateman and Dr. Deem, this patient's Because Dr. Bateman, who went back and forth between saying he could do sedentary work or he is severely limited, i.e., couldn't do work at all, the suggestion there is that he couldn't even lift 2 pounds or something of that nature on the DSHS form. Dr. Deem, and I'm not suggesting that we're bound by Dr. Deem, but Dr. Deem said that he could occasionally lift 20 pounds and that I believe he could frequently lift 10 pounds was the record from Dr. Deem. But we heard from Mr. Talbot this explanation about the boxes on sedentary versus severely limited. Isn't it true that throughout Dr. Bateman's reports, he consistently reported that Mr. Abbott was unable to perform at least half-time on a normal day-to-day basis? He never wavered from that conclusion, did he? I think that's right, Your Honor, that he never wavered from that. Okay. So his bottom line, as he explained it, was always the same, correct? Well, he took that off, but I would submit to the Court that there's ambiguity. There's ambiguity. If the doctor says at times that he's sedentary and at times that he can't do any work, that creates an ambiguity. If one doctor says that he can do right work. But that's not what he said in the end. Every time he said it, we have five reports, I believe, which Dr. ---- Well, in one report he said he can't work for six months. In another report he said he can't work for the next 6 to 12 months. And there were five reports, and three other times he said indefinitely. Right. So what's inconsistent about that? I mean, you're sort of in the situation where he's seeing him on a progressive basis. So I had trouble understanding why ---- Maybe he relaxes and leans. Right. I mean, I see it as you have a terribly candid physician, although the bottom line doesn't change. The patient isn't exactly the same every day that he shows up. So he's just being honest about it, isn't he? I mean, the real question is what's his bottom line, and was there a basis for discounting it? Because that's really where we go off the rails on this case. If you discount his ---- appropriately discount his view, then, you know, then it seems to me the commissioner wins. But if you ---- his view was inappropriately discounted, then you kind of start with a different premise. Am I correct in my analysis? That's right. Okay. So he's kind of a linchpin. Yeah. Is it appropriate? Well, how about Affitt's own testimony about his pain and so forth? That was discounted as well, wasn't it not? It was discounted, Your Honor, and it was discounted. And was there a good reason for that? There was good reason because of his activities of daily living that he testified to. Now, they're not extremely robust activities of daily living, but the ALJ noted that he could go to the grocery store, carry his groceries. He did work around the house. It suggested to the ALJ that he could do more than what he would claim. You know, I see this daily activity stuff in case after case after case. Everybody can do something during the day, at least of all the cases we see that come up to here. The question is, what can they do, how much can they do, how often can they do it, at what pace can they do it, and can they do it on a sustained basis, day after day after day, in a full-time job, so that he could do some of this? That's all right, Your Honor, but with respect, that evaluation of all those factors that you just laid out is a function of the ALJ and not of the reviewing court. But I think that for the ALJ to take his testimony and to say, based on the daily activities that he describes, I conclude that he is capable of full-time work, is simply to misread the testimony that he gives about his daily activities. Well, if that's your conclusion, Your Honor, then you're entitled to it. But to make that the point on which this case turns, you have to say that no reasonable person could read the record the way that the ALJ did. Well, it's not quite the test. The test is whether or not he has sufficient evidence to ignore what the treating physician tells him. Well, specific and legitimate. Let's see if we agree on this. Specific and legitimate reasons based on substantial evidence. Is that correct? It's got to be more than just substantial. It's not as if we're reviewing a jury verdict. That's right. It's a tighter test than that. Okay. On that point, apart from the daily activity issue, didn't, as I recall, there was a discounting of his sleep apnea situation, correct? That's right, Your Honor. Because he claimed that he had the, he had this machine, the CPAP machine. Right. And there were records suggesting that it was being treated fine with the CPAP machine. And then at one point, the claimant said, well, this machine is not, it's not helping me. But the ALJ pointed to the fact that he hadn't gone back and he had not obeyed the doctor's suggestion. He had not taken up the doctor's suggestion as to what he could do with the CPAP machine. Because the doctor, Bateman, I guess it was, does consistently diagnose severe sleep apnea, correct? Yes. And the ALJ. And the ALJ takes that into account. Okay. I mean, I think that the sleep apnea is not the issue. I mean, you are free to disagree, obviously. But I think that the sleep apnea is not the issue on which the case turns. I mean, the ALJ includes a severe impairment of sleep apnea in the decision and includes in his residual functional capacity that he's not to be driving or handling machinery. So do you think that his credibility turns on whether we must uphold the finding with respect to the daily activity description? I think that's it in a nutshell, Your Honor. So we have his credibility and the status of Dr. Bateman. That's right. All right? Thank you. Thank you. Actually, I'm sorry. Do we have a question? Just one question, which is not specific to this case. And you may or may not be able to help me with an answer to this. I've been doing this job now for about eight years. And in the last year, I've seen more Social Security disability cases than I've seen in all the other years combined. And at least a fair number of the cases I've seen this year are pretty plausible appeals on the part of the claimant. Number one, am I perceiving that there's a different rate of appeal? Number two, if I am, what's going on? I think that it's just a statistical blip, Your Honor. I can't really. First of all, the only regions, obviously, that I only have any contact with Region 10. And we hear from Region 9, which is the California cases. But I don't know that we have perceived a notably greater rate of appeal or quality of appeals. It may be, but I'm sorry. Okay. There's no reason you necessarily would know. Okay. Thank you. Did you have some time for rebuttal? No. I think on the issue of the activities of daily living cited by the judge in support of the notion that Mr. Abbott could work, is a failure by the ALJ to explain in full detail why the judge believed that the activities of daily living were inconsistent with a claim of disability. We all know that people don't have to be completely helpless in order to qualify for Social Security disability benefits. We also know that when people act in their daily affairs, they set their own pace, they set their own schedule, they make decisions about what they do, when they do, based upon, as in the case of Mr. Abbott, how he feels at any particular time. So to say that just because somebody does activities doesn't mean that they have the pace, the persistence, the stick-to-it-ness, if you will, of what's required of a job going eight hours a day, five days a week. The judge just simply concluded, without real explanation, why the activities pointed to an ability to work. As to the issue of the sleep apnea, you know, Mr. Abbott was fired from his job because he fell asleep driving a company vehicle. Wife. Yes. And this was an individual that was working. I mean, he wasn't, like, sitting back waiting for somebody to send him a check. The man was working, and it was his medical condition which caused him to be terminated. And as we expressed in our brief on page 25, our opening brief, there was numerous references in this record of the fact that the CPAP machine just wasn't working very well. They had made adjustments, there had been numerous references to going back and trying to get it fixed and trying to get it adjusted, and it simply wasn't working very well. So the other thing that really concerns us is what we understand or what we believe to be a misinterpretation of the DSHS forms by the ALJ. The bottom line was that the doctor always said that Mr. Abbott was not able to work, and sometimes Mr. Abbott might have been marginally more functional on some days and marginally less functional on other days, and it was simply the doctor expressing that. But he never changed his opinion ever that Mr. Abbott was able to work. Thank you. Thank you. Thank both counsel for your argument. The case of Abbott v. Commissioner is submitted.
judges: Hug, McKeown, W. Fletcher